Filed 6/29/15  Yang Jin Co. v. Kong CA2/2

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| YANG JIN CO., LTD., | B233894 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC403206) |
| v. | |
| YOUNG WON KONG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Luis Lavin, Judge.  Reversed and remanded in part and affirmed in part.

Browne George Ross, Peter W. Ross, Benjamin D. Scheibe, Corbin K. Barthold for Defendant and Appellant.

Ryu Law Firm, Thomas J. Ryu for Plaintiff and Respondent.

_____

Plaintiff and respondent Yang Jin Co., Ltd. (Yang Jin) sued defendant and appellant Young Won Kong. Yang Jin and Kong had jointly operated a garment dyeing business. Yang Jin claimed, among other things, that Kong defrauded Yang Jin and misappropriated funds from the business. A jury returned a verdict in favor of Yang Jin and against Kong, awarding $4.7 million in damages.

On appeal, Kong argues that the majority of Yang Jin's claims could only be brought through a derivative, not direct, action, and that the damages award was contrary to the facts and law. Yang Jin's deficient respondent's brief does little to counter Kong's arguments, most of which are well taken.

We find that the jury's verdict can be upheld only as to one cause of action for which damages were awarded—for breach of oral contract. Accordingly, we reverse the judgment, in part, and direct the trial court to modify the judgment to reflect a damages award of $1.5 million.

## BACKGROUND

**Facts**

Before getting his start in the garment and apparel business, Kong worked in banks, as a vice president in loan departments.[1] In 1995, Kong started a garment manufacturing company. He went on to establish a number of apparel companies, as either full or part owner. These companies included Fashion Solutions International, Inc., and Greenwest LLC (Greenwest). Kong also formed a company in Guatemala called Fashion Solutions Guatemala (FSG).

In 2004, Kong, with two partners, purchased a company—which Kong named Lekos—to produce and dye fabric in the United States. The fabric was then sent to

---

[1]    This statement of facts reflects the applicable standard of review following a jury trial. "We state the facts in the light most favorable to the jury's verdict, resolving all conflicts and indulging all reasonable inferences to support the judgment." (*Green Wood Industrial Co. v. Forceman Internat. Development Group, Inc.* (2007) 156 Cal.App.4th 766, 770, fn. 2; see also *American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1459.)

Guatemala, where FSG would use the fabric to make clothing for sale in the United States. Kong's business volume increased to the point that Lekos became unable to handle all dyeing work, so Kong began using a subcontractor in Guatemala, World Fama, for additional dyeing jobs.

By 2005, Kong's companies employed about 100 people in Los Angeles and 1,200 in Guatemala, and had annual sales of approximately $43 million. Kong wished to continue expanding operations, and began looking for an equity partner. He approached Ji Soo Ryu, the president of a large Korean clothing company, Yang Jin. Kong told Ryu that if Yang Jin loaned him $1 million, Yang Jin would receive a significant return. Accordingly, in 2006, Yang Jin, through a subsidiary, loaned $1 million to Greenwest.

Soon after Yang Jin made the initial loan, Kong presented a second proposal for a "better" business deal. Kong told Ryu that by acquiring World Fama, the dyeing company in Guatemala, Kong's businesses would gain a substantial amount of synergy, would save on costs, and would make more money. Kong wanted Yang Jin to contribute capital to purchase World Fama. He told Ryu that the dyeing factory would generate large profits, and Yang Jin would be able to recoup its entire investment within three years and share in the profits.

Kong proposed various scenarios by which Yang Jin could contribute to the purchase of World Fama. Eventually, in around February 2007, Yang Jin (through Ryu) orally agreed with Kong to form a joint venture for the purchase and operation of the Guatemalan dyeing business. The members of the joint venture were Yang Jin, Kong, and Lekos. Yang Jin was to invest $2 million, Kong was to invest $2 million, and Lekos would invest $500,000. These funds were to be used to purchase World Fama for $4.3 million, with the remainder used for operations. Yang Jin entered into the joint venture agreement because Ryu trusted Kong based on his purported experience and abilities, and because Kong, as an individual, was a party to the joint venture.

As part of their agreement in forming the joint venture, Yang Jin and Kong decided they would need a corporate vehicle in the United States to act as the parent of the Guatemalan business. Kong set up both the parent company, L.A. Guatemala

3

Partnership, LLC (LAG), as well as the Guatemalan company, LA USA Dyeing & Finishing (D&F).

Kong requested of Yang Jin that Kong be delegated authority to operate the venture, including the handling of orders and shipment of goods. Yang Jin agreed to the request, but did not agree to grant full control of the joint venture to Kong—for example, Kong was not allowed to transfer, mortgage, or sell assets of the venture without Yang Jin's approval.

After the parties agreed to form the joint venture, in April 2007 the parties executed an "operating agreement" governing the affairs of LAG, the American parent company. At the time of execution of the operating agreement, Yang Jin made a $1 million loan to Kong, and soon after made a $2 million payment, to cover the investment called for in the joint venture agreement. Unbeknownst to Yang Jin, however, Kong did not invest the $2 million that he promised to contribute.

D&F took over World Fama's operations after it was purchased by the joint venture in June 2007. Approximately one year later, in May 2008, Ryu traveled to Guatemala to observe D&F's facilities. Based on financial statements previously provided by Kong, Ryu believed that D&F's long-term liabilities totaled $1.5 million. A balance sheet found in the accounting department at D&F, however, showed long-term liabilities of $3.4 million. The head of the accounting department at D&F informed Ryu that the liabilities reflected a bank loan of $3.5 million. Ryu then learned that a Guatemalan bank, Banco Industrial, made the loan to D&F, and in order to get the loan, D&F pledged all of its assets and its cash flow as collateral. The financial statements previously provided to Yang Jin did not reflect the loan or the pledge, Kong had never informed Yang Jin about the obligation, and Yang Jin never approved the loan.

Ryu flew from Guatemala to Los Angeles to question Kong about the undisclosed loan. Kong refused to admit the existence of the loan until Ryu confronted him with the corroborative balance sheet. Ryu eventually discovered that Kong had taken $2 million

4

from the loan and transferred it to Greenwest. Greenwest then used that money to make Kong's required investment in the joint venture.[2]

After demanding and receiving further financial documents from Kong, Yang Jin discovered more improprieties. For example, it discovered that Kong took more than $100,000 from D&F to pay employees of Kong's private company, FSG. D&F also did $1.68 million worth of work for FSG, for which D&F never received payment. In addition, Kong transferred $60,000 from LAG to Greenwest. Moreover, approximately $900,000 of D&F's funds were used to make principal and interest payments on the Banco Industrial loan. Although Kong used proceeds of the loan to make his investment in the joint venture, neither he nor his companies made payments on the loan.

Kong quickly depleted almost all of D&F's funds. D&F exhausted its supplies and could not pay its creditors. The only option Yang Jin had to keep the company running was to give D&F an additional $809,000. Despite Yang Jin's efforts, D&F lost approximately $2.7 million between 2009 and 2010.

Eventually, Kong promised Yang Jin that he would pay back $2 million of the $3.5 million loan. Kong also pledged all of his shares in LAG and FSG as security, in case he failed to repay the $2 million. Kong further promised to sell FSG-owned real estate in Guatemala and use the proceeds to reduce the venture's debts.

---

[2]     At trial, an expert retained by Yang Jin explained (based on his review of financial documents) how money flowed through the companies. In February 2007, Greenwest made a $500,000 down payment to World Fama. Yang Jin made its initial $1 million loan in April 2007, and afterward its $2 million investment. In May 2007, Lekos made its $500,000 investment. In June 2007, $3.5 million was transferred from LAG to D&F, and this money was used to complete the purchase of World Fama for a total of $4 million. After the World Fama acquisition, Kong pledged the assets of D&F and FSG to obtain a $3.5 million loan. D&F then, using loan funds, transferred $500,000 to LAG and $2 million to Greenwest. Of this $2 million, Greenwest transferred $1.5 million to LAG and retained $500,000 to repay its earlier $500,000 down payment. In September 2007, LAG repaid Yang Jin its $1 million loan. In summary, Yang Jin and Lekos both made their agreed upon investments, while Kong (through Greenwest) contributed $1.5 million using the funds from the undisclosed loan.

Kong, however, failed to repay the $2 million. In addition, he did not turn over his shares in LAG or FSG to Yang Jin—it turned out that Kong had already pledged the shares to a bank in Los Angeles, Nara Bank. At least one obligation apparently was met, though. The Guatemalan real estate was sold, and the proceeds were used to offset amounts owing from FSG to D&F.[3]

**Procedural Background**

In December 2008, Yang Jin filed suit against Kong and various other defendants, including Greenwest. The operative first amended complaint, filed in January 2010, alleged 12 causes of action against Kong.

A 10-day jury trial was conducted in January and February 2011, with only Kong and Greenwest remaining as defendants. The jury found Greenwest liable for breach of contract and awarded Yang Jin $1.1 million. Kong was found liable on seven separate causes of action: breach of the joint venture agreement, breach of the share pledge agreement, fraud, negligent misrepresentation, breach of fiduciary duty, conversion, and breach of the covenant of good faith and fair dealing. The jury awarded damages on four of these claims—$1.5 million for breach of the joint venture agreement, $100,000 for fraud, $1.1 million for negligent misrepresentation, and $2 million for conversion—for a total of $4.7 million in damages.

Kong thereafter filed motions for new trial and for judgment notwithstanding the verdict, both of which were denied. Kong timely appealed the judgment.

## DISCUSSION

Kong asserts that the judgment was unsupported by the evidence, and that it rested upon errors of law. "In reviewing the sufficiency of evidence on appeal, we resolve all conflicts in favor of the prevailing party and we indulge all legitimate and reasonable inferences to uphold the verdict if possible. 'It is an elementary, but often overlooked

---

[3]    It does not appear that this sale took place at the behest of Kong. Instead, the record indicates that, due to a default, Banco Industrial took control of the land and sold it at public auction.

6

principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' [Citation.]" (*Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023, 1043.) We review questions of law de novo. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.)

As the respondent to this appeal, Yang Jin was under no obligation to file a respondent's brief. (See *Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 273; *Kriegler v. Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 226-227.) Since it did choose to file a brief, however, it was required to comply with relevant appellate rules, including California Rules of Court, rule 8.204(a)(1)(C), which directs a party, when referencing a matter in the record, to cite to the record where the matter appears. Yang Jin's purported statement of facts, comprising approximately 15 pages, contains essentially no citations to the record. Furthermore, much of Yang Jin's argument relies on asserted facts for which no record citation is provided. We exercise our discretion to disregard any of these alleged facts where no record support is apparent. (See *Dominguez v. Financial Indemnity Co.* (2010) 183 Cal.App.4th 388, 392, fn. 2 ["because [respondent's] brief fails to provide a citation to the appellate record for these facts, we do not consider them"].)

Nevertheless—despite the clear deficiencies in Yang Jin's brief—Kong still bears the burden of demonstrating reversible error. (*Boyle v. CertainTeed Corp.* (2006) 137 Cal.App.4th 645, 649-650 ["[A]n appealed judgment is presumed correct, and appellant bears the burden of overcoming the presumption of correctness."].)

## I. <u>Conversion</u>

Kong contends that the jury's award of $2 million on the conversion claim has no legal validity because the subject of the conversion claim was money that belonged to D&F or its corporate parent LAG, not to Yang Jin.

Yang Jin brought the conversion claim as a direct action against Kong, not as a derivative action. A claim is derivative, rather than direct, if its gravamen "'is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets.'" (*Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 106.) A fraudulent transfer of company assets without compensation results in injury to the company itself, and therefore gives rise to a derivative action. (*PacLink Communications Internat. v. Superior Court* (2001) 90 Cal.App.4th 958, 964 (*PacLink*).) Members of a limited liability company are not directly injured by such a transfer; instead, their injury is a diminution in the value of their holdings in the company. (*Ibid.*)

Members of a limited liability company cannot sue individually for injury to the company. (*PacLink*, *supra*, 90 Cal.App.4th 958, 965.) "'It is a general rule that a corporation which suffers damages through wrongdoing by its officers and directors must itself bring the action to recover the losses thereby occasioned, or if the corporation fails to bring an action, suit may be filed by a stockholder acting derivatively on behalf of the corporation. An individual [stockholder] may not maintain an action in his own right . . . for destruction of or diminution in the value of the stock. . . .'" (*Rankin v. Frebank Co.* (1975) 47 Cal.App.3d 75, 95.)

It is clear from the record that the subject of the $2 million conversion award was the money that Kong transferred from D&F's loan proceeds to Greenwest. Although Kong engaged in a variety of misdeeds, this transfer was the act most likely to support a conversion claim, and the only one involving a sum of exactly $2 million. Indeed, jury instructions pertaining to the conversion claim specifically identified $2 million as the amount that Kong and/or Greenwest allegedly took. This transfer likely caused direct harm to D&F and its corporate parent LAG, but caused no direct harm to Yang Jin. If

8

anything, Yang Jin only suffered a diminution in the value of its holdings, which is derivative harm.[4]

Yang Jin does not demonstrate that it properly brought a direct claim. Instead it argues that Kong waived the argument that the claim was derivative by failing to raise it below. The record shows, however, that both Kong and Yang Jin repeatedly raised the issue in the trial court. Yang Jin itself filed a pretrial brief on "direct vs. derivative injuries." Kong also raised the issue in a pretrial brief, objected at trial that Yang Jin was seeking damages incurred by D&F, and moved for nonsuit on the issue. Kong further raised the issue in his motion for judgment notwithstanding the verdict. Given this record, we cannot find a waiver on the part of Kong. Nor did the lack of a jury instruction on derivative versus direct injury result in a waiver, since the issue was a question of law for the court to decide. (*Stofer v. Shapell Industries, Inc*. (2015) 233 Cal.App.4th 176, 188-189 [the court decides questions of law, while the jury determines issues of fact].)

Therefore, because Yang Jin could only bring the conversion claim derivatively and failed to do so, the judgment must be reversed insofar as it awards damages to Yang Jin for conversion.

## II. Fraud

Yang Jin's fraud claim suffers a similar fate. The jury awarded $100,000 to Yang Jin for fraud damages, a figure resembling only the amount that Kong took from D&F to pay FSG salaries. An exhibit introduced by Yang Jin at trial pegged the amount used on D&F salaries at $115,318.38. In closing argument, when laying out damages, Yang Jin's counsel stated that Kong "used over a hundred thousand dollars of D&F's money to pay for his own employees." Meanwhile, the next closest basis of damages suffered by Yang Jin was the $809,000 that it was forced to put into D&F to keep it from failing. Thus, it

---

[4]     Actually, since most, if not all, of the $2 million was transferred back to LAG, it is unclear how much, if any, damages resulted from the conversion.

is clear that the jury's award of $100,000 could only be predicated upon D&F's payment of FSG salaries.

This misappropriation likely gave rise to a derivative action, but it did not support a direct action. The conduct dissipated assets of D&F, causing harm to the company itself. (See *Jones v. H. F. Ahmanson & Co.*, *supra*, 1 Cal.3d 93, 106.) Yang Jin, therefore, had no standing to seek recovery of the wages directly.

Again, Yang Jin does not argue the propriety of bringing a direct rather than derivative action, or whether the award compensated for a derivative injury, but simply contends that Kong waived the issue by failing to raise it below. As discussed above, the issue was not waived. Therefore, the award of $100,000 for fraud must be reversed.

## III. Breach of oral joint venture agreement

The jury found that Kong breached a joint venture agreement—the parties to which were Kong, Yang Jin, and Lekos—and that Yang Jin was damaged by the breach in the amount of $1.5 million. On appeal, Kong argues that Yang Jin cannot recover for breach of oral agreement because any joint venture agreement was superseded by the written LAG operating agreement. Furthermore, according to Kong, damages awarded to Yang Jin were based on the prospect of a profitable venture, but Yang Jin never proved it was entitled to a profit from the joint venture.

We find that Yang Jin presented evidence sufficient to establish that it entered into a joint venture agreement—between itself, Kong, and Lekos—that was separate and distinct from the LAG operating agreement. Ryu, Yang Jin's president, testified that the parties entered into the oral joint venture agreement in around February 2007, that the oral joint venture agreement was separate from the LAG operating agreement, and that Kong made numerous promises that formed the basis of the joint venture agreement. These included a promise to invest $2 million in the joint venture, to contribute real estate to the joint venture, to represent Yang Jin's as well as Kong's own interests, to bring a supply of stable orders, and to carry out acquisition-related work.

It is true, as pointed out by Kong, that the LAG operating agreement called for a $2 million investment by Kong's company, Greenwest. The LAG operating agreement,

10

however, did not incorporate other obligations that Ryu testified were a part of the oral joint venture agreement. Moreover, the LAG operating agreement did not reference Kong as a party, while Ryu repeatedly testified that Kong himself was a party to the joint venture agreement. Nor do we find that the LAG operating agreement superseded an earlier oral joint venture agreement. Although the operating agreement contained an "entire agreement" clause, it was relatively narrow, pertaining only to parties' rights and obligations with respect to "the company"—i.e., LAG.

At trial, Kong's attorney argued that the evidence showed only the existence of the LAG operating agreement, and not an oral joint venture agreement. When the existence of a contract is disputed, the trier of fact decides whether the contract actually existed. (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208.) We find that there was substantial evidence for the jury to determine that the parties entered into an oral joint venture agreement separate and distinct from the LAG operating agreement.

Kong's argument that Yang Jin never established it was entitled to a guaranteed profit also fails. At trial, Yang Jin's expert provided two estimates of the "benefit of the bargain" Yang Jin could have expected if Kong had performed as agreed. The expert's more liberal estimate calculated benefit of the bargain damages at $5,128,850, while the more conservative estimate valued them at $1,539,125. The jury awarded damages of $1.5 million for breach of the joint venture agreement, with 600,000 compensating for past economic loss, and $900,000 for future economic loss. Kong asserts that this award was based on the expert's lower estimate.

It is not clear that the jury based its damages award on the expert's analysis, however. There was evidence that Yang Jin was forced to put an additional $809,000 into the venture. It is possible that the jury based its award partially on this figure, with future economic loss based on additional amounts that Yang Jin would likely have to pay. Even if the jury did base its award on the expert testimony, however, we find no error. Benefit of the bargain damages are recoverable for breach of contract. (Civ. Code, § 3300; see *Al-Husry v. Nilsen Farms Mini-Market, Inc.* (1994) 25 Cal.App.4th 641, 648-649.) The jury was entitled to find that Yang Jin was made worse off in the amount of

11

$1.5 million because Kong failed to comply with the terms of the joint venture agreement.

Kong argues that the parties agreed to share losses, and that this term precluded Yang Jin from seeking any expected profit. But if Yang Jin's injuries were caused by Kong's breach, Yang Jin had a right to recover damages. If there had been no breach, then an agreement to share losses would have more pertinence. The evidence supported a finding of a breach, however, and Yang Jin never agreed to refrain from seeking damages for breach of contract.

## IV. Negligent misrepresentation

On appeal, Kong asserts that the jury's finding of liability for negligent misrepresentation was based on representations made by Kong after Yang Jin discovered both the undisclosed loan and Kong's failure to directly invest $2 million in the business. Following Yang Jin's discovery, Kong, in June 2008, agreed to pay back $2 million of the $3.5 million loan and to pledge all of his shares in LAG and FSG as security. Kong argues that Yang Jin suffered no "out-of-pocket" losses by relying on these further representations. Instead, according to Kong, the jury's award of $1.1 million was based on benefit of the bargain damages, which are not recoverable on a negligent misrepresentation claim. In response, Yang Jin concedes that the jury awarded benefit of the bargain damages for negligent misrepresentation, but argues that such damages were proper.

Yang Jin is incorrect. Benefit of the bargain damages put a plaintiff in the position it "would have enjoyed had the false representation been true," awarding plaintiff the difference in value between what it expected to receive and what it actually received. (*Fragale v. Faulkner* (2003) 110 Cal.App.4th 229, 236 (*Fragale*)). While benefit of the bargain damages are recoverable for *fraud* perpetrated by a fiduciary[5] (*Salahutdin v.*

---

[5]    In the special verdict, with respect to a separate breach of fiduciary duty claim, the jury found Yang Jin and Kong to be fiduciaries based on their common interests in the joint venture.

12

*Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 566-568), only actual, out-of-pocket losses are recoverable for a fiduciary's negligent misrepresentation. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1249-1250; *Fragale*, *supra*, 110 Cal.App.4th at pp. 236-237.) Thus, while Yang Jin potentially could have recovered benefit of the bargain damages on its separate fraud claim, it could not do so for negligent misrepresentation. Therefore, since the jury's verdict awarding benefit of the bargain damages for negligent misrepresentation has no basis in law, it must be reversed.

## DISPOSITION

The judgment is reversed, in part, and remanded to the trial court to reflect judgment in favor of Kong on the fraud, conversion, and negligent misrepresentation causes of action, and to reflect a damages award of $1.5 million in favor of Yang Jin and against Kong, with prejudgment interest to be calculated accordingly. In all other respects, the judgment is affirmed.

The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


                                        BOREN, P.J.

We concur:


        CHAVEZ, J.


        HOFFSTADT, J.


13